UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

UNITED STATES OF AMERICA,

v.

RICHARD LIPSKY,

Defendant.

------------------------------------------------------------X

11-CR-300 (JSR)

**SENTENCING MEMORANDUM OF RICHARD LIPSKY**

GERALD B. LEFCOURT, P.C.
Gerald B. Lefcourt
Faith A. Friedman
148 East 78th Street
New York, NY 10075
Tel: (212) 737-0400
Fax: (212) 988-6192
E-mail: lefcourt@lefcourtlaw.com

*Attorneys for Richard Lipsky*

September 24, 2012

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......... iii

Introduction .......... 1

I. The History And Characteristics Of Richard Lipsky .......... 2

A. Dr. Lipsky's Personal Background .......... 3

B. Dr. Lipsky's Professional Life .......... 5

II. The Nature And Circumstances Of The Offense .......... 6

A. Factual Background .......... 7

1. The Lipsky/Kruger Relationship .......... 7

2. The Inception Of The Scheme .......... 8

3. The Official Acts And Unique Circumstance Of The Offense Conduct .......... 10

III. The Applicable Guidelines And Presentence Report ("PSR") .......... 13

A. The Applicable Guidelines .......... 13

B. The Presentence Report .......... 13

IV. A Below Guidelines Non-Jail Sentence Is Justified .......... 15

A. Sentencing Framework Following *Booker* .......... 15

B. Dr. Lipsky's Acceptance Of Responsibility, [redacted] Sincere Remorse, And Post-Offense Rehabilitation Justify A Non-Jail Sentence .......... 17

C. Dr. Lipsky's Unique Family Circumstances Warrants A Below-Guidelines Non-Jail Sentence .......... 21

D. Dr. Lipsky Has Led An Otherwise Law-Abiding Life And The Aberrant Nature Of His Conduct Warrants A Below-Guidelines Sentence .......... 26

E. Dr. Lipsky's Good Works Throughout His Life Warrant A Below-Guidelines Sentence .......... 29

F. Dr. Lipsky's Age Justifies A Below-Guidelines Sentence .......... 32

G. A Jail Sentence Is Not Necessary To Comply With The Purposes of § 3553(a)(2) ........33

CONCLUSION ........................................................................................................36

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Gall v. United States*,
552 U.S. 38 (2007)....................16, 17, 34, 35

*United States v. Adelson*,
441 F. Supp. 2d 506 (S.D.N.Y. 2006)....................16

*United States* v. *Arboleda*,
2009 U.S. Dist. LEXIS 37780 (E.D.N.Y. 2009)....................28

*United States v. Booker*,
543 U.S. 220 (2005).................... *passim*

*United States v. Bouquillon*,
2009 U.S. Dist. LEXIS 118300 (E.D.N.Y. 2009)....................2

*United States v. Canova*,
412 F.3d 331 (2d Cir. 2005)....................29

*United States* v. *Castillo*2007
U.S. Dist. LEXIS 101879 (S.D.N.Y. 2007) ....................35

*United States* v. *Chen*,
2005 U.S. Dist. LEXIS 12045 (S.D.N.Y. 2005)....................28

*United States v. Cho*,
2009 U.S. Dist. LEXIS 95943 (E.D.N.Y. 2009)....................20

*United States v. Clay*,
2007 U.S. App. LEXIS 7616 (11th Cir. 2007) ....................17, 18

*United States* v. *Gamez*,
1 F. Supp. 2d 176 (E.D.N.Y. 1998) ....................28

*United States v. Gayle*,
2010 U.S. Dist. LEXIS 60259 (E.D.N.Y. 2010)....................2

*United States v. Greene*,
249 F.2d 262 (2d Cir. 2003)....................31

*United States v. Hamilton*,
2009 U.S. App. LEXIS 7848 (2d Cir. 2009) ....................32

*United States v. Hawkins*,
2007 U.S. App. LEXIS 9932 (2d Cir. 2007) ....................17

*United States v. Hernandez*,
2007 U.S. Dist. LEXIS 1371 (S.D.N.Y. 2005)....33

*United States v. Hodges*,
2009 U.S. Dist. LEXIS 10683 (E.D.N.Y. 2009)....32

*United States v. Huerta*,
371 F.3d 88 (2d Cir. 2004)....21

*United States v. Jones*,
460 F.3d 191 (2d Cir. 2006)....21, 29

*United States v. Metellus*,
2010 U.S. Dist. LEXIS 30244 (E.D.N.Y. 2010)....2

*United States v. Ministro-Tapia*,
470 F.3d 137 (2d Cir. 2006)....16

*United States v. Sanchez*,
2007 WL 60517 (S.D.N.Y. 2007)....32

*United States v. Singh*,
2009 U.S. Dist. LEXIS 113915 (E.D.N.Y. 2009)....2, 20

*United States* v. *Toback*,
2005 U.S. Dist. LEXIS 6778(S.D.N.Y. 2005)....28

*United States v. Williams*,
475 F.3d 468 (2d Cir. 2007)....13, 15

**STATUTES**

18 U.S.C. 1952(a)(3)....1

18 U.S.C. § 371....1

18 U.S.C. § 3553....1, 16, 29

**UNITED STATES SENTNECING GUIDELINES**

[redacted]

5H1.1....32

**OTHER AUTHORITIES**

*Measuring Recidivism: the Criminal History Computation of Federal Sentencing Guidelines, A Component of the Fifteen Year Report on the U.S. Sentencing Commission's Legislative Mandate, 12* (May 2005), http://www.ussc.gov/publicat/Recidivism_General.pdf ........32

*Recidivism Among Federal Prisoners Released in 1987 at 21* (Federal Bureau of Prisons 1994), http://www.bop.gov/news/research_projects/published_reports/recidivism/oreprrecid87.pdf. ........32

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X
UNITED STATES OF AMERICA,

v. 11-CR-300 (JSR)

RICHARD LIPSKY,
Defendant.
-----------------------------------------------------X

**SENTENCING MEMORANDUM OF RICHARD LIPSKY**

**Introduction**

This memorandum and accompanying letters are respectfully submitted on behalf of defendant Richard Lipsky ("Dr. Lipsky") to assist the Court in determining the appropriate sentence for Dr. Lipsky.

Dr. Lipsky fully accepts responsibility for his utter lapse in judgment and his regrettable choice to cross the line. He stands before the Court having pled guilty to one count of conspiracy to commit bribery in violation of 18 U.S.C. § 371 and one count of bribery in violation of 18 U.S.C. 1952(a)(3), and facing an advisory Guidelines sentence of between 57 months and 71 months incarceration. [REDACTED]

[REDACTED]

While Dr. Lipsky understands that he cannot undo what he has done, by accepting responsibility for his actions [REDACTED], he has taken significant steps at rehabilitation and to mitigate the impact of his crime.

As discussed in more detail below, given the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), and based on the factors set forth in 18 U.S.C. § 3553 [REDACTED]

[REDACTED] his post-offense rehabilitative efforts and acceptance of responsibility; his unique family circumstances, the aberrant nature of

his conduct; his demonstrated commitment to helping others; the consequences that have already befallen him as a result of his arrest and prosecution; and the unlikelihood that his conduct will be repeated; a below-Guidelines non-jail sentence is an appropriate disposition here. We submit that any harsher sentence would be "greater than is necessary" to comport with the goals of § 3553(a)(2).

## I. The History and Characteristics of Richard Lipsky

Determining a just and proper sentence for Dr. Lipsky warrants consideration not only of the conduct for which he finds himself before the Court, but of the whole of Dr. Lipsky's life, that of his family, his professional career, and his character. What such a glimpse reveals is a man motivated not by greed or self interest, but rather, by a desire to help his clients. Unfortunately, Dr. Lipsky became overzealous in that honorable pursuit and crossed the line.

As the following discussion will make clear, Dr. Lipsky is deserving of leniency and special consideration. [REDACTED] Dr. Lipsky's personal and professional achievements and lifetime of hard work justify the imposition of a below-Guidelines non-jail sentence. *See e.g., United States v. Gayle*, 2010 U.S. Dist. LEXIS 60259, *4-5 (E.D.N.Y. 2010) (non-jail sentence for defendant with Guidelines of 37 to 46 months based on employment history, community service, and strong family relationships); *United States v. Metellus*, 2010 U.S. Dist. LEXIS 30244, *4-5 (E.D.N.Y. 2010) (six month sentence for defendant with Guidelines of 63 to 78 months because defendant "worked hard, fulfilled his family responsibilities, achieved a good educational record under difficult conditions, earned a law degree, and became a member of the bar"); *United States v. Bouquillon*, 2009 U.S. Dist. LEXIS 118300, at *4 (E.D.N.Y. 2009) (six month sentence for criminal history Category II with Guidelines of 78-97 months, because defendant was a "hard-working dairy farmer" who was "goodhearted to his neighbors"); *United States v. Singh*, 2009 U.S. Dist. LEXIS 113915, at *5

(E.D.N.Y. 2009) (time served for drug defendant with Guidelines of 70-87 months because he was hard working, helped support his family, otherwise led a lawful life, and showed remorse).

While we attempt to detail aspects of Dr. Lipsky's life, the letters provided herewith illuminate Dr. Lipsky's character more deeply, and far more persuasively, than could be summarized by counsel.[1] As you will see, the letters, written by people from all walks of life who know Dr. Lipsky in a variety of contexts, present an unmistakable picture of Dr. Lipsky as a caring and compassionate individual, who is dedicated to his family, his friends, and his clients, and has always lived a law-abiding life, with the exception of this case. Indeed, the letters are replete with examples of the positive impact Dr. Lipsky has had on the lives of others. We ask the Court to read them in full, but we provide some relevant highlights herein.

**A. Dr. Lipsky's Personal Background:**

Richard Lipsky was born April 13, 1947, in New York, New York, the youngest of two children born to David and Ruth Lipsky. Dr. Lipsky's father, who died of natural causes in 2000, was a theatrical press agent. His mother, who succumbed to lung cancer in 1974, was a stay at home mom, who later went back to school and became a school psychologist. In addition to his parents, Dr. Lipsky's grandfather, Louis Lipsky, played a prominent role in his upbringing.

The Lipskys instilled in Dr. Lipsky the values of hard-work, strong moral character, and the importance of family, community, education, and a strong Jewish identity. Dr. Lipsky's parents and grandfather were very supportive of and particularly close with Dr. Lipksy. His mother helped him develop his intellectual curiosity; his father, a love of sports, the theater, and the press; and his grandfather sparked his interest in politics.

[1] Due to the number of letters we submit them in a separately bound indexed volume.

Things by no means were perfect. [REDACTED] [REDACTED]. This often created tensions at home. [REDACTED] [REDACTED]

Dr. Lipsky was academically gifted. He was named salutatorian of his junior high school class and thereafter attended the Bronx High School of Science, where he also excelled. Upon graduating from the Bronx High School of Science in 1964, Dr. Lipsky attended Clark University where he continued to play basketball and was the sports editor of the school paper. He graduated in 1968 with a Bachelor of Arts degree in history.

In 1973, Dr. Lipsky obtained a Master's Degree in political science from Hunter College, followed by a doctorate in political science from the Graduate Center at the City University of New York in 1979. An adaptation of Dr. Lipsky's dissertation on the political and social impact of American sports, entitled *How We Play The Game*, was published by Beacon Press in 1980. Since then his work has been widely published in both scholarly journals and local media.

In 1968, Dr. Lipsky met his first wife, Jeri Wellman. A year later, the two were married and Dr. Lipsky began teaching at a public elementary school in Washington Heights. The stress of teaching full time, going to graduate school at night, and starting a family put insurmountable strain on the marriage. After nearly ten years of marriage and two children, Jonathan and Katherine, the couple separated, eventually divorcing in 1980.

While Dr. Lipsky maintained regular contact with his children and provided financial support to them, as time went on and he remarried and had two more children, their relationship deteriorated. Dr. Lipsky no longer is close either with Jonathan or Katherine, something that has been particularly painful for Dr. Lipsky. Fortunately, Dr. Lipsky recently was in contact with Katherine and the two are working to reestablish their relationship.

Dr. Lipsky met his second wife, Dorothy, in 1978, after he and his first wife were separated. The couple found that they had a great deal in common, even though they came from very different backgrounds. Dr. Lipsky was drawn to Dorothy's family and their suffering in the Holocaust moved him. Dorothy was attracted to Dr. Lipsky's gentleness, intellect, and solidity, because her own home was emotionally chaotic.

On March 9, 1980, they were married. Together, the Lipskys have two children, Matthew, age 30, and Rachele, age 28. Dr. Lipsky has always been a loving, supportive father to Matthew and Rachele and a devoted husband to Dorothy. He attended his children's sporting events, often coaching their teams, assisted with their homework, and more. *See* Letters of Matt Lipsky at Tab 5 and Rachele Lipsky at Tab 6. He is close with them both.

**B. Dr. Lipsky's Professional Life**

After leaving the public school system, Dr. Lipsky taught at a number of institutions of higher learning. Thereafter, he began working as a policy analyst for the New York City Criminal Justice Coordinating Council. In 1981, he left to start his own business, Richard Lipsky Associates.

Richard Lipsky Associates was a unique government relations (lobbying), public relations and public policy consulting firm, with Dr. Lipsky at its helm. The firm focused on the politics of environmental law, land use review and the protection and enhancement of neighborhood retailers. His work involved grassroots organizing of community interests and the creation of coalitions between neighborhood retailers, unions and civic groups. He fought tirelessly against big box stores like Wal-Mart, BJs, and Costco; he fought against unfair government practices like eminent domain; and he fought to protect the way of life of the communities and the small businesses of this city.

Dr. Lipsky's brand of lobbying was singular among those in New York State. As one client so aptly put it, Dr. Lipsky was "one of the most unique kind of lobbyists New York City has ever known". *See* Letter of John Catsimatidis at Tab 15. He did not spend much time in the halls of the State House or advocating for or against legislation. Instead, his focus was on the preservation of a way of life of a declining segment of this city.

He fought his battles armed with a cell phone, a blue tooth headset, and a computer, spending most of his day gathering information to effectively advocate for his clients; calling various local and state officials to plead his clients' cases; mobilizing and arming the media with information; and strategizing. When Dr. Lipsky was not on the phone, he was "blogging"; drafting memos, talking points, and press releases; and organizing press conferences and rallies. Dr. Lipksy would shine a spotlight on facts his opponents would rather have left in the dark, and was a thorn in their sides. If he was fortunate enough to garner the support of an elected official, he would feature them prominently in his campaign, including them in his written materials and blog posts, and at his rallies and press conferences.

And, he was effective. Not because he had war chests of money, because he was an "insider", or because he traded on relationships. Rather, he was effective because he was tenacious, informed, well reasoned, articulate and persuasive.

He was considered a lobbyist mainly because as part of his work he interacted with elected officials –for which he was paid – and at times provided traditional lobbying services. However, traditional lobbying, was not the cornerstone of his business. Nor was it his passion.

## II. The Nature and Circumstances of the Offense

Dr. Lipsky unequivocally accepts that he engaged in unlawful conduct and takes full responsibility for doing so. While there is no question that Dr. Lipsky has pled guilty to a

serious offense, the circumstances surrounding his involvement merits some additional explanation.

**A. Factual Background**

**1. The Lipsky/Kruger Relationship**

Dr. Lipsky and Mr. Kruger first met in 1999 (years before the instant offense), while Dr. Lipsky was working with local store owners to organize a campaign against a proposed Shoprite on Flatlands Avenue in Brooklyn. As a staunch supporter of the opposition, Dr. Lipsky featured Mr. Kruger in the media campaign, as he often did. The fight lasted a year, during which time Mr. Kruger experienced firsthand the type of services Dr. Lipsky provided his clients, his effectiveness, and how he promoted those who supported his causes. What followed was a decade long collaboration with the two advocating on the same side of a host of quality of life and small business issues – without a single allegation of a penny being exchanged.

Since during this time, which preceded by years the inception of the criminal conduct, Mr. Kruger supported many of Dr. Lipsky's clients' causes, Dr. Lipsky often figured Mr. Kruger in his blogs, press releases, and elsewhere. The two worked well together and over time developed a symbiotic professional relationship. They spoke often, predominantly about the issues of the day, and met on occasion. They were colleagues and allies, but not friends, did not always agree on the issues, and they had no financial relationship.

Dr. Lipsky was polished and well read, an intellectual who could effectively advocate a position, and a strategist who could formulate and implement successful campaigns for his clients. Mr. Kruger did not have that same skill set and quickly came to realize what an asset Dr. Lipsky could be to him. Dr. Lipsky became a resource for Mr. Kruger, someone who helped him present better reasoned, informed, and persuasive arguments; prepared talking points and press

releases for him; and generally made Mr. Kruger more appealing to his constituents, *i.e.*, campaign contributors.

**2. The Inception of the Scheme**

Through the course of this relationship Dr. Lipsky and Mr. Kruger shared personal information about themselves, including about their families for whom they each cared deeply. During these times, Mr. Kruger discussed his "boys", Michael and Gerard Turano, who Dr. Lipsky understood to be Mr. Kruger's "step-sons" – the sons of Mr. Kruger's companion, Dottie Turano.

In the summer of 2007, Mr. Kruger told Dr. Lipksy that the Turanos were dissatisfied with the medical profession and finding it difficult because of insurance companies. Mr. Kruger explained that he was assisting them in transitioning out of medicine and into political consulting and government relations (lobbying). Mr. Kruger suggested Dr. Lipsky could help them.

Dr. Lipsky believed Mr. Kruger was genuine and was willing to assist. He had a very important client who was considering becoming a candidate for citywide office. Dr. Lipsky was assisting this client with strategy, which involved garnering the support of local political and community leaders. He specifically identified the Turanos as a possible source of help in this effort and even arranged meetings between his client and the Turanos. In the end, his client did not retain their services.

During this same period, Mr. Kruger and Dr. Lipsky began discussing a local project in Brooklyn, which had the potential for the development of a box store. Mr. Kruger was opposed to the project and hoped Dr. Lipksy would oppose it, which Dr. Lipsky did.

Throughout the course of those discussions, Mr. Kruger suggested that Dr. Lipsky retain the services of the Turanos' firm, Olympian Strategic Development Corp. ("Olympian"), to assist with grassroots opposition. Mr. Kruger explained that the Turanos had helped run his

reelection campaigns and they were well known and well received in the local community due to their association with Mr. Kruger and their mother's position as district manager of the Community Board. Dr. Lipsky agreed to retain Olympian, but the arrangement did not work out.

Despite assignments from Dr. Lipsky, the Turanos never accomplished anything. Instead of ending the relationship then, as he should have, Dr. Lipsky, not wanting to upset Mr. Kruger, continued to pay the monthly retainer until the end of 2008, when all work on the project ceased. Notably, there is not a single allegation that Mr. Kruger engaged in official action to benefit Dr. Lipsky, his clients, or his family, during this time – despite the financial relationship between Dr. Lipsky and Olympian. Indeed, according to the government's allegations the first official act by Mr. Kruger to benefit Dr. Lipsky and his clients did not occur until 2009. However, from that moment on, Dr. Lipsky was on his way to becoming Mr. Kruger's "pawn" and "entrenched in [Mr.] Kruger's scheme"; although, seemingly nothing else had changed about their relationship.

Since it was clear Olympian was not working out as a consultant for Dr. Lipsky, in the summer of 2008, Mr. Kruger proposed a new idea: Dr. Lipsky and the Turanos, along with an "Albany" lobbyist and two others, should become partners in a government and public relations firm. Mr. Kruger himself envisioned joining the firm upon his retirement from the Senate.

Dr. Lipsky was reticent but intrigued and felt compelled to entertain Mr. Kruger's idea about which he had been insistent. At Mr. Kruger's urging, a meeting was arranged in July 2008 between Dr. Lipsky and the proposed Albany lobbyist. That meeting was followed by a meeting arranged by Mr. Kruger at a midtown hotel. In attendance were Dr. Lipsky, the Albany lobbyist, the Turanos, Mr. Kruger, and two others.

From the meeting it was clear that Dr. Lipsky was not interested. Dr. Lipsky had an established business, a proven track record, and longstanding clients, all of which he was being asked to contribute to the firm. The others had little to contribute: the Albany lobbyist had

connections, but no clients; the Turanos touted their connections and experience, but had no clients; Mr. Kruger still was a sitting Senator; and none of them had been a lobbyist or a public relations or public policy consultant.

Everyone understood that Dr. Lipsky would need to be persuaded to move forward. So, Mr. Kruger hatched a plan to refer clients to Dr. Lipsky – and then demand recompense. And that is exactly what happened.[2] It bears repeating that, as probation explains, having become so vested in Mr. Kruger and "entrenched in his corrupt scheme", Dr. Lipsky had become Mr. Kruger's "pawn" and was loath to turn down the referrals or refuse to pay the 50 percent referral fee that Mr. Kruger demanded for Olympian, after Dr. Lipsky was retained. All told, Mr. Kruger referred four clients to Dr. Lipsky and assisted him in obtaining the business of two others. All the while, Dr. Lipsky still was representing a bevy of clients on a host of issues that did not involve Mr. Kruger.

**3. The Official Acts And Unique Circumstance Of The Offense Conduct**

Through the referral arrangement the relationship between Dr. Lipsky and Mr. Kruger eventually crossed the blurry line between lawful and unlawful. While there never were specifically agreed upon official actions Mr. Kruger was expected to take, when Dr. Lipsky agreed to pay Olympian, Dr. Lipsky and Mr. Kruger entered into a tacit understanding that, in part, in exchange for the referral Mr. Kruger would take official action to benefit Dr. Lipsky and his clients.

More specifically, Dr. Lipsky essentially was insured unfettered access to Mr. Kruger – he always took Dr. Lipsky's calls, always met with Dr. Lipsky, and always met with his clients. In addition, Mr. Kruger continued to advocate for the causes on which he and Dr. Lipsky had

---

[2] Mr. Kruger also had other reasons to refer these clients to Dr. Lipsky: he wanted to assist them, his constituents, to engender goodwill and the prospect of a campaign contribution in the future.

worked together in the past, and voted in favor of legislation that he and Dr. Lipsky's clients supported. However, in many ways this paints a distorted view of the extent to which Mr. Kruger acted to benefit Dr. Lipsky and his clients.

To be sure, as detailed *supra,* Mr. Kruger's actions were consistent with the nature of Dr. Lipsky's and Mr. Kruger's relationship prior to the exchange of monies, as well as, many of Mr. Kruger's longstanding positions. One such example is Mr. Kruger's opposition to the development of Wal-Mart in Brooklyn. Mr. Kruger had publically opposed Wal-Mart coming to New York City since at least 2005, years before the inception of the scheme. In fact, on February 3, 2005, Mr. Kruger issued a press release calling Wal-Mart the "'Kiss of Death' For City's Small Businesses" and announcing that he had signed on to the Wal-Mart Free NYC Committee. *See* PSR ¶ 37. Even before that he appeared at a rally Dr. Lipsky had organized in opposition to the development of a Wal-Mart outside of Mr. Kruger's district.

Similarly, with respect to Mr. Kruger's ongoing support for the collection of taxes from the sale of cigarettes on Native American lands to non-Native Americans, Mr. Kruger had twice voted in favor of legislation that supported enforcement and collection, once in 2004 and once in 2005; all well before the inception of the scheme. Prior to these votes, Mr. Kruger had collaborated and consulted with Dr. Lipsky on the issue. PSR ¶ 36. And there are many other such examples. *Id.* ¶¶ 29, 30, and 31.

What is more, some of the very clients on whose behalf the government has alleged Mr. Kruger acted were referred to Dr. Lipsky by Mr. Kruger after Mr. Kruger had expressed a desire to assist them and support their causes. Even more tellingly, when Mr. Kruger did not agree with a position Dr. Lipsky was advocating or support legislation he favored, or if Mr. Kruger did not believe it was in his best interests to do so, Mr. Kruger did not support Dr. Lipsky and his client's interests and at times even acted against those interests.

We acknowledge fully that these facts neither constitute a legal defense to the charges, nor do they eliminate the question as to whether Mr. Kruger was spurred to act more forcefully than he otherwise would have, whether he would have been more vehement in his opposition, or whether he would have afforded these courtesies to Dr. Lipsky, had the monies not been paid. Nevertheless, it is important to understand that Mr. Kruger accepted Dr. Lipsky's referral fees and failed to take action beyond that which he already demonstrated that he was inclined to take. Similarly, as noted, it is significant that the government has not alleged that Mr. Kruger took a single official action for the benefit of Dr. Lipsky and/or his clients until 2009, more than a year after Dr. Lipsky's first payment to Olympian.

Mr. Kruger also assisted Dr. Lipsky in finding a part-time job for his wife, Dorothy, who was laboring under significant stress and needed a productive outlet outside of the home. Although typically there is nothing unlawful in Dr. Lipsky asking for Mr. Kruger's assistance, particularly since Mrs. Lipsky was qualified to perform the work, Mr. Kruger did so in an inappropriate manner.

In short, there can be no dispute that generally speaking the mere existence of the bribery scheme was harmful to the public good and undermined the public's confidence in our democratic system of government. However, it is equally true and worthy of consideration that the specific official actions allegedly taken by Mr. Kruger were not contrary to the public's interest, were believed to be to their benefit, and most importantly, were consistent with positions and actions Mr. Kruger had taken and collaborated on with Dr. Lipksy for years before a single dollar was exchanged.

## III. The Applicable Guidelines and Presentence Report ("PSR")

### A. The Applicable Guidelines

Dr. Lipsky pled guilty pursuant to a plea agreement that includes a stipulated Guidelines calculation. That calculation, set forth in the agreement and detailed in the Presentence Report, results in an offense level of 25. PSR ¶ 4(g). Having no prior criminal record, Dr. Lipsky's agreed upon criminal history category is I. *Id.* at ¶ 4(h). The resulting Guidelines sentencing range is 57 to 71 months imprisonment.

Of course, as discussed *infra*, under applicable law, the Guidelines calculation is entitled to no special weight when considering an appropriate sentence. Instead, a sentencing court must arrive at a sentence "sufficient, but not greater than necessary, to comply with the purposes of §3553(a)(2)". *United States v. Williams*, 475 F.3d 468, 477 (2d Cir. 2007). In other words, the Guidelines calculation is not a presumptively reasonable starting point or sentence.

Consistent with these principles, the terms of the plea agreement permit either party to seek a sentence outside of the stipulated Guidelines sentencing range based on the factors delineated in § 3553(a). [REDACTED]

### B. The Presentence Report

The PSR recommends a sentence of 30 months imprisonment [REDACTED]. While we agree that as a starting point in fashioning an appropriate sentence there should be a significant variance below the stipulated Guidelines range, we do take issue with certain of the characterizations of

Dr. Lipsky. In particular, we disagree with the PSR's characterization of Dr. Lipsky's conduct as akin to, but "somewhat more deleterious" than Mr. Kalish's. PSR at p. 29.

The PSR reasons that as with Mr. Kalish, Dr. Lipsky was willing to agree to participate in Mr. Kruger's scheme because it would be a "boon" to his business. PSR at p. 29. But neither the evidence nor the government's allegations support that contention. Dr. Lipsky was not motivated by money or greed. His business had been a going concern for years. He served a core client group, many of whom had Dr. Lipsky on a regular retainer. While other clients retained Dr. Lipsky's on an as needed basis, they turned to Dr. Lipsky for assistance repeatedly over the years. That did not change with the morphing of Dr. Lipsky's and Mr. Kruger's relationship. In fact, with limited exception, his core client base remained the same, as did the nature of his business. What is more, Mr. Kalish, whom it is alleged referred to Mr. Kruger as his "partner" to putative clients, telling them by retaining ADEX they, had Mr. Kruger on the payroll and thereby leveraging their corrupt relationship to build and maintain his business. The same cannot be said about Dr. Lipsky.

While it was no secret that Dr. Lipsky and Mr. Kruger had a longstanding relationship professionally, and Dr. Lipsky did nothing to hide that, there is not a single allegation that Dr. Lipsky leveraged their corrupt relationship with clients. Dr. Lipsky never referred to Mr. Kruger as a "partner" in his lobbying business; he never explicitly told or even inferred to a colleague, friend, client, or opponent that Mr. Kruger was "in his pocket" or under his control whatsoever. In fact, just the opposite. At times he may have identified Mr. Kruger as a possible ally on an issue, but thereafter he worked hard to convince Mr. Kruger to be that ally.

In fact, after entering into the bribery scheme, Dr. Lipsky did not change his approach to any particular project. Nor did Dr. Lipsky change his interactions and dealings with Mr. Kruger, other than being required to pay the referral fees. He did not rest on his laurels and assume the

payments to Olympian meant Mr. Kruger's support was a foregone conclusion – it was not. Dr. Lipsky did not tell Mr. Kruger that he owed him for the money being paid to Olympian. Nor did he espouse that to clients, colleagues, or other elected officials. Instead, Dr. Lipsky actively lobbied Mr. Kruger as he had done for years and as he did with any other public official whose support he was seeking. He prepared position papers and policy memos, and presented his arguments in favor of and strategies for the success of each of his campaigns. Where appropriate he rallied his supporters, organized likeminded groups and individuals, prepared innumerable blogs, issued press releases, and held press conferences. The same is not true for Mr. Kalish.

In addition, Mr. Kalish acted purely for personal gain or profit and Dr. Lipsky did not. Nor does the government allege so. That Dr. Lipsky earned money during the course of this scheme is hardly unique; all the defendants did. In this regard, Dr. Lipsky's motivations were more akin to those of Dr. Aquino or David Rosen, who were driven by a desire to serve the patients of their hospitals and the communities those hospitals served. Similarly, Dr. Lipsky's motivation was singularly focused on furthering the causes of his clients, causes he believed in and clients he saw as in peril. Of course he was paid for that work, but, so too, were Dr. Aquino and Mr. Rosen.

In short, while Dr. Lipsky's conduct was wrong, and he is culpable for it, we do not believe his conduct is akin to Mr. Kalish's or that he is more culpable than Mr. Kalish.

## IV. A Below Guidelines Non-Jail Sentence is Justified

### A. Sentencing Framework Following *Booker*

Following *Booker*, it is well settled that, after calculating the applicable sentencing range under the Guidelines, a sentencing court must consider all § 3553(a) factors to determine "a sentence sufficient, but not greater than necessary, to comply with the purposes" of section 3553(a)(2). *Williams*, 475 F.3d at 477. A sentence that exceeds that requirement is unreasonable,

as is implicit in the statute and made explicit in cases that have explicated the district court's role in sentencing. As the Second Circuit has held, ". . . if a district court were explicitly to conclude that two sentences equally served the statutory purpose of §3553, it could not, consistent with the parsimony clause, impose the higher". *United States v. Ministro-Tapia*, 470 F.3d 137, 142 (2d Cir. 2006). In other words, the Court must impose the lowest possible sentence that serves the interests of justice and complies with the stated purposes of 3553(a)(2).[3]

Neither *Booker* nor § 3553(a), however, recognizes the Guidelines range or any other § 3553(a) factor as being a super-factor or even a first-among-statutory-equals. It is one factor to be considered. And, while the Guidelines generally are considered "the starting point and the initial benchmark" of a reasonable sentence, they should not be presumed reasonable. Instead the Court "must make an individualized assessment". *Gall v. United States*, 552 U.S. 38, 49-50 (2007). As this Court, has explained:

> [S]urely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, "the history and characteristics of the defendant".

*United States v. Adelson*, 441 F. Supp. 2d 506, 513-514 (S.D.N.Y. 2006).

---

[3] The stated purposes of 3553(a)(2) are:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most efficient manner.

Having described the defendant, followed by the offense conduct and the relevant Guidelines range, we follow the practice in this Circuit and next address the soundness of the additional bases for a sentence below the Guidelines, and then lastly turn to other relevant factors enumerated in §3553(a). Giving all factors their due consideration, the appropriate sentence, the lowest possible sentence necessary to serve justice and comport with the stated purposes of 3553(a)(2), is, we submit, a below-Guidelines non-jail sentence.

### B. Dr. Lipsky's Acceptance of Responsibility, [REDACTED] Sincere Remorse, and Post-Offense Rehabilitation Justify a Non-Jail Sentence

Exceptional post-offense rehabilitation is an appropriate reason to impose a below-Guidelines sentence and has been upheld in this Circuit and others as sufficient justification for imposing such a sentence under *Booker*. *See e.g., Gall*, 552 U.S. at 41 (affirming below-Guidelines non-jail sentence for drug defendant with Guidelines range of 30-37 months based on post-offense rehabilitation); *United States v. Hawkins*, 2007 U.S. App. LEXIS 9932, *5-6 (2d Cir. 2007), (affirming below-Guidelines non-jail sentence for defendant who committed crime while on pre-trial release, based on defendant's post-offense rehabilitation, pursuant to § 3553(a)); *United States v. Clay*, 2007 U.S. App. LEXIS 7616 (11th Cir. 2007) (affirming below-Guidelines sentence of 60 months for drug defendant with Guidelines range of 188-235 months, based primarily on post-offense rehabilitation).

Dr. Lipsky not only has taken responsibility for his actions, but he has gone to great lengths to make amends and rehabilitate himself. [REDACTED]

[REDACTED]:



[REDACTED]

[REDACTED] Dr. Lipsky has demonstrated post-offense rehabilitation by trying, at the age of 65, to put his life back together as best he can. He has been actively working to develop a consulting business outside of the political arena, a very difficult task, particularly given Dr. Lipsky's age. He also has served as a consultant on a *pro bono* basis to a number of not-for-profit organizations, including those geared towards improving our criminal justice system, particularly for indigent defendants. And, he has spent significant time rededicating himself to his family.

Dr. Lipsky is truly sorry for his conduct, and the impact it has had on the public at large, as well as on his clients, his family, and his friends. He realizes that he risked all that he worked for by his crime. He knows it was a terrible lapse in judgment, was irresponsible, and he deeply regrets his actions. He has been humiliated by having to "confess" to family, friends, and social acquaintances that he committed a crime – each new conversation more painful than the last, but he does not try to excuse or minimize the seriousness of his conduct. He has lost his business, the sole means of support for his family, and has jeopardized their well being. His first concerns have never been for himself, but for those who have been affected by his misdeeds. He is truly sorry for what he has done.

Indeed, a number of his family and friends have asked the Court for leniency at sentencing based in part on the sincere remorse they have witnessed as Dr. Lipsky agonizes over his poor choices and inability to change the past. As Dr. Lipsky's son, Matt, writes:

> As I learned in law school, the notion of justice is difficult to encapsulate. With that said, I always came away with understanding that in addition to punishing the wicked it is meant to afford clemency to the sincerely repentant. I can say without a doubt that I have been witness to my father's utter and deep

> remorse. Considering his regret, his incredible dedication to his family and his clients and his track record as a law-abiding citizen, I sincerely as that you show my dad the utmost leniency.

Letter of Matt Lipsky at Tab 5. Still others point out:

> I feel in my heart that a lengthy sentence, in Mr. Lipsky's case, would neither benefit or protect society or be a means of just punishment and rehabilitation; which, I believe, are the core reasons for incarceration. Certainly the anguish and remorse over his serious error in judgment, and its affect on his family, will be a harsh punishment he will endure every single day.

Letter of Irene Prestigiacomo at Tab 42; *see also* Letter of Richard Schrader at Tab 8 ("Richard has admitted his mistakes and I believe has enormous remorse for them"); Letter of John Catsimatidis at Tab 15 ("He has recognized his own failings in the matter before you and has already suffered greatly because of his ill conceived actions"). And there is no one who has seen Dr. Lipsky's remorse more than his wife, who explains:

> The Richard I know is a kind and good man but because of the consequences of his poor judgment, I am watching a decent man walk a little less straight and smile a lot less. He and I talk about his plea all the time and he knows his behavior was not acceptable. He is truly remorseful and tells me every day in ways that a wife of 33 years knows is truthful.

*See* Tab 4.

While Dr. Lipsky's prompt acceptance of responsibility is reflected in the three-level reduction in his Guidelines calculation, we submit that his timely acceptance of responsibility, [REDACTED] post-offense rehabilitation, and his sincere remorse for the criminal conduct in which he engaged are all factors that may be considered in imposing, and justify the imposition of, a below-Guidelines non-jail sentence pursuant to § 3553(a). *See United States v. Cho*, 2009 U.S. Dist. LEXIS 95943, *5-6 (E.D.N.Y. 2009) (below-Guidelines sentence based, in part, on contrition); *United States v. Singh*, 2009 U.S. Dist. LEXIS 113915, at *5

(E.D.N.Y. 2009) (time served for drug defendant with Guidelines of 70-87 months based on defendant's remorse).

To put Mr. Lipsky in jail now, so long after his criminal conduct, and while he is working so hard to rebuild his life and reinvent himself professionally, would undo his sincere efforts to make amends for his crime.

**C. Dr. Lipsky's Unique Family Circumstances Warrants A Below-Guidelines Non-Jail Sentence**

In the Second Circuit, it is well settled that a defendant's family ties and responsibilities may be a basis for a below-Guidelines sentence. *United States v. Huerta*, 371 F.3d 88, 94 (2d Cir. 2004) (*quoting Koon v. United States*, 518 U.S. 81 (1996)). While typically these cases involve the "absence or presence of adults who can step in during the defendant's incarceration to assist with caring and providing for the defendant's", they are not limited to such circumstances. *Id.* at 95. Nor following *Booker*, is strict adherence to the notion that the circumstances must be "exceptional" in nature to be worthy of consideration required. *See United States v. Jones*, 460 F.3d 191, 194 (2d Cir. 2006) ("With the entire Guidelines scheme rendered advisory by the Supreme Court's decision in *Booker,* the Guidelines limitations on the use of factors to permit departures are no more binding on sentencing judges than the calculated Guidelines ranges themselves").

By all accounts, Dr. Lipsky is dedicated to his close-knit family. From colleagues, to friends, to family members, the view is the same: Dr. Lipsky is committed to his family and they come before all else. As a former colleague of Dr. Lipsky observed:

> In the short time I have known Richard there have been a few consistent threads that weave through his character: his courage and hard work on behalf of his clients; his loyalty to those he believes in; and his love, compassion and dedication to his family.

Letter of Jennifer Carlson at Tab 14. Even Dr. Lipsky's accountant has recognized his devotion. Letter of Lawrence Brown at Tab 1 ("The Richard Lipsky I represented was a man who always thought first of his family".). So have many others with whom Dr. Lipsky interacted. *See* Letter of Morton Sloan at Tab 45; Letter of Matt Lipsky at Tab 5; Letter of Richard Schrader at Tab 8.

In many ways Dr. Lipsky's devotion to his family can best be seen in the context of his



...



has had a number of setbacks. Although she obtained her undergraduate degree from the University of Pennsylvania,

It was at this point that Dr. Lipsky was arrested.





While Dr. Lipsky's wife is available and also enjoys a close relationship , she cannot replace Dr. Lipsky for the type of support he provides. First, as a result of Dr. Lipsky's arrest, Mrs. Lipsky was fired from her part-time job counseling victims of domestic violence in the Orthodox community. Although she has looked for a job ever since, given her age and the publicity surrounding Dr. Lipsky's arrest, it has been difficult.

To compound matters, Mrs. Lipsky is the main caretaker for her mother, who is suffering from dementia. Over the past several years Mrs. Lipsky has spent countless nights traveling to Brooklyn to intercede with home health care aides. *See* Letter of Dorothy Lipsky at Tab 4. Dr.

Lipsky has been by her side constantly, to drive her to Brooklyn, to visit her mother for lunch, and now to take Mrs. Lipsky to her mother's nursing home in Riverdale. [redacted]

[redacted]

[redacted]

[redacted]

The circumstances faced by the Lipsky family clearly exceed the kind of adversities common to families who face the prospect of a loved one being incarcerated. Dr. Lipsky is key to [redacted], we submit that Dr. Lipsky's family circumstances support a below-Guidelines non-jail sentence.

**D. Dr. Lipsky Has Led An Otherwise Law-Abiding Life And The Aberrant Nature Of His Conduct Warrants A Below-Guidelines Sentence**

Looking at his life before and after his criminal conduct, there is no question that Dr. Lipsky's behavior stands out in stark contrast to an otherwise law-abiding life and was clearly aberrant. As one letter-writer succinctly put it: ". . . his recent conduct is not an accurate barometer to measure his life and work". *See* Letter of Karen Binder at Tab 33. And there are many others who feel the same:

> While he has clearly made some serious mistakes, I don't believe these lapses in judgment represent the sum of him as a human being.

Letter of Jennifer Carlson at Tab 14; *see also* Letter of Adam Chodos at Tab 2 ("Richard is at his core a good man and someone who benefits his family, friends and community with his presence".); *accord* Letter of Rachele Lipsky at Tab 6 ("My dad is one of the most kind-hearted, ethical, and genuine people I know-almost to a fault".).

A lifetime of hard-work, professional accomplishments, law-abidingness and devotion to family and community, has been marred by a serious lapse in judgment that caused Dr. Lipsky to engage in wrongful conduct, from which he gained relatively little financially. The letters submitted on Dr. Lipsky's behalf, especially those who have dealt with him in the context of business, express a repeated sense of shock that Dr. Lipsky could ever have been involved in the offense for which he pled guilty, or any criminal offense for that matter.

> It came as an unfortunate surprise to us, that Richard engaged in any improper conduct. In our experience, he has been a person of integrity who is genuinely dedicated to protecting the interests of communities and small business.

Letter of Jake Bono at Tab 35.

> Richard has been a hard worker, resourceful, dedicated and conscientious. We are aware of the legal problems that confront him, something that really breaks my heart. In all the years that I have known him, Richard has never suggested any shady or illegal course of action. We have always found him to be honorable as well as capable.

Letter of Morton Sloan at Tab 45.

> I have spoken to hundreds of business people over the many years that I have known Richard and have never heard his talents, ethics or industriousness questioned.

Letter of Howard Tisch at Tab 29.

It is also clear that Dr. Lipsky's departure from living a law-abiding life relatively speaking was of limited duration. As was mentioned earlier, Richard Lipsky was a public relations and public policy consultant and lobbyist for over 25 years before the criminal conduct at issue ensued. And, even after it began, Dr. Lipsky's criminal conduct was relatively limited when compared to the legitimate work in which he was involved on a daily basis that did not involve Mr. Kruger. Moreover, at 65 years of age Dr. Lipsky has never before been arrested.

In short, it is clear that Dr. Lipsky's criminal conduct was of a limited duration, was something that Dr. Lipsky has not and will not repeat, and that he has made significant efforts to mitigate his misconduct. Accordingly, we respectfully submit that a below-Guidelines non-jail sentence is appropriate, a sentence the Court clearly has ample power and authority to impose under the circumstances presented herein. *See, e.g., United States* v. *Arboleda,* 2009 U.S. Dist. LEXIS 37780, *4-5 (E.D.N.Y. 2009) (non-Guidelines sentence in light of "aberrational" nature of offense given defendant's good work history, strong family relationships, and no criminal history); *United States* v. *Toback,* 2005 U.S. Dist. LEXIS 6778, *12(S.D.N.Y. 2005) (non-Guidelines sentence of time served and supervised release because, *inter alia,* criminal conduct was "aberrational", spanned a short period, and involved minimal planning); *United States* v. *Chen,* 2005 U.S. Dist. LEXIS 12045, *9 (S.D.N.Y. 2005) (non-Guidelines sentence in part because defendant had not engaged in criminal activity prior to the offense); *United States* v. *Gamez,* 1 F. Supp. 2d 176, 184 (E.D.N.Y. 1998) (below-Guidelines sentence based on conduct that did "not typify the usual behavior of the defendants", first offenders, who had "stellar work histories", and were "upstanding members of the community").

**E. Dr. Lipsky's Good Works Throughout His Life Warrant A Below-Guidelines Sentence**

The Second Circuit has long recognized the district court's power to mete out a below-Guidelines sentence on the basis of a defendant's good works. *See e.g. United States v. Canova*, 412 F.3d 331, 358-59 (2d Cir. 2005). Since *Booker*, however, such good works no longer are required to be "extraordinary" in order to be worthy of leniency and consideration. *See Jones, supra,* 460 F. 3d at 194.

There can be no doubt that standing on their own, as well as in consideration with the many other factors discussed herein, Dr. Lipsky's good works show his true character and justify a below-Guidelines non-jail sentence. Indeed, any greater sentence would be harsher than necessary to achieve the stated purposes of § 3553.

Dr. Lipsky's has had a lifetime of good citizenship. He always made time to attend to his community and society in general, whether that be in the form of less formal expressions of concern where he found people in need or in more formal *pro bono* work. As Brian Ketcham, a traffic consultant with whom Dr. Lipsky often collaborated explains:

> During the 30-years that we have worked together Richard and I have taken on powerful interests and, in many instances, beaten them. When I refer to the "powerful" I mean rich developers and government officials who work to force their projects on communities that are powerless to protect themselves. This is where Richard Lipsky stands alone. In the four decades that I too have been assisting the powerless, I have never encountered anyone like Richard. He knows the inequity that exists between low and moderate income people and the very rich. Few have the courage to stand up for the rights of these people and fewer still actually make a difference. His loss will be missed by the disenfranchised as well as by government leaders who themselves try to right wrongs and by all New York communities who continue this fight.
>
> . . . some of the projects we did together were pro-bono; others we received partial . . .payment . . .

*See* Tab 18.

Even Floyd Abrams observed how Dr. Lipsky always treated people with kindness and respect:

> He cared about the people he introduced us to; he empathized with the owners of tiny bodegas; he treated people who spoke little to no English and who had little to no money with respect and regard. He seemed to me an especially decent person in circumstances in which he would receive no reward for being so. He still does.

Tab 10. This is a sentiment shared by others as well.

> I believe that through his treatment of others and the love and compassion he has bestowed upon his family and friends, Richard Lipsky has had a positive impact on society. Most importantly for purposes of this situation, I believe Richard has a great deal more goodness to offer if allowed the chance.

Letter of Jennifer Carlson at Tab 14.

But there is more. The little acts of kindness and compassion, the support when someone needed it, have been recounted as well. For example, Dr. Lipsky's nephew writes:

> Richard is the type of fellow whom most anyone feels comfortable around with his direct and easy style. In difficult situations, even when Richard was justified to be angry or vengeful, I have never seem him take that path but rather the high road. Several years ago, I was experiencing significant family strife which created a bit of anguish. While most friends and family stay away from charged situations, Richard reached out to let me know he appreciated where I was coming from and made the time to visit and check in on me, when few others did. To me, character is doing the right thing especially when you do not expect any credit for it.

Letter of Adam Chodos at Tab 2. Dr. Lipsky's wife also recalls the times Dr. Lipsky would drop everything because she was having difficulties:

> I remember we had a gas leak in our backyard. Instead of calling the gas company, my first frightened call went to Richard (of course the Gas Company was contacted). Instead of being impatient with me, he heard the fear in my voice and came back home in the middle of his busy work day. There also was the time that he was away in Atlantic City at a convention when I

> discovered a raccoon in our chimney. Richard jumped into the car and two hours later was back to be with me until the chimney sweep could take care of the animal. Three hours later he drove back to Atlantic City for work.

Letter of Dorothy Lipsky at Tab 4. As does Dr. Lipsky's daughter Rachele:

> My Dad was the one person I knew who could decipher my readings and classroom assignments. On the day before my final, he saved me by dropping his whole work day, driving down to Philly, getting a hotel room-and for the better part of an entire night he really schooled me in the basics of political theory.

Letter of Rachele Lipsky at Tab 6.

As can be seen, Dr. Lipsky has dedicated time to helping better the lives of those around him. His commitment to good works cannot be dismissed as the kind of fund-raising activities or charitable donations typically pursued or made by many white-collar defendants. Nor can it be expressed through the amount of money either that he gave or raised but rather through the donation of "a much more valuable commodity, his time". *United States v. Greene*, 249 F.2d 262, 264 (2d Cir. 2003). His good deeds were never performed with an eye towards gaining prestige or status within a community, but rather, because he is driven to help. Indeed, the cornerstone of his business, his life's work, has been to help those in need.

In closing, we draw your attention to the letter of James Boyle, retired President of the Uniform Firefighters Association, who worked with Dr. Lipsky on fire safety issues:

> In February 1993, after the first terrorist attack on the World Trade Center that caused six (6) deaths and injured one thousand (1000) people, Richie tirelessly spent, days, weeks, and months lobbying for improved legislation to increase safety for the people working in high-rise buildings, specifically the World Trade Center. Thanks to Richie and improvements made thousands of lives were saved on September 11, 2001. I will be forever grateful to Richie because – although my son Michael was killed – so many others survived the horrendous attacks. After September 11, 2001 Richie reached out to me immediately and was heartbroken by Michael's death – and the death of so many, especially firefighters. We met and I had to console Richie by reminding him of all the lives saved

> because we fought so hard for the implementation of fire safety improvements. I am forever grateful.

*See* Tab 36.

**F. Dr. Lipsky's Age Justifies A Below-Guidelines Sentence**

The November 1, 2010 Guideline amendments to section 5H1.1 provide for increased consideration of a defendant's age during the sentencing process. Dr. Lipsky is 65 years old, has worked hard his entire life, and has been a productive member of society. His age may be considered in imposing a below-Guidelines sentence based on the fact that older defendants have a lower rate of recidivism than younger defendants.

Studies by the United States Bureau of Prisons[4] and United States Sentencing Commission[5] have concluded that recidivism rates are inversely related to age at release; the older the person, the lower the rate of recidivism. Based on the Sentencing Commission study, those between forty-one and fifty at the time of sentencing and in criminal history Category I have only a 6.9% rate of recidivism, compared with a rate of 29.5% for those under twenty-one and, 12.1% for those aged thirty-six in Category I.

Consistent with these findings, we submit that Dr. Lipsky's age supports a below-Guidelines non-jail sentence in this case. *See United States v. Hamilton*, 2009 U.S. App. LEXIS 7848, *8 (2d Cir. 2009) ("district court abused its discretion in not taking into account policy considerations with regard to age recidivism not included in the Guidelines"); *United States v. Hodges*, 2009 U.S. Dist. LEXIS 10683, *26 (E.D.N.Y. 2009); *United States v. Sanchez*, 2007

---

[4] Miles D. Harer, *Recidivism Among Federal Prisoners Released in 1987 at 21* (Federal Bureau of Prisons 1994), http://www.bop.gov/news/research_projects/published_reports/recidivism/oreprrecid87.pdf.

[5] *Measuring Recidivism: the Criminal History Computation of Federal Sentencing Guidelines, A Component of the Fifteen Year Report on the U.S. Sentencing Commission's Legislative Mandate, 12* (May 2005), http://www.ussc.gov/publicat/Recidivism_General.pdf.

WL 60517 *4 (S.D.N.Y. 2007) (below-Guidelines sentence based on the lower rate of recidivism among older defendants); *United States v. Hernandez*, 2007 U.S. Dist. LEXIS 1371, *12 (S.D.N.Y. 2005) (below-Guidelines sentence based in part on low probability of recidivism given defendant's age).

**G. A Jail Sentence Is Not Necessary To Comply With The Purposes of § 3553(a)(2)**

Finally, a sentence of incarceration is not necessary to meet the goals of §3553(a)(2). Rather, a non-jail sentence both is reasonable and satisfies the stated sentencing goals. Dr. Lipsky realizes he committed a serious offense, promptly accepted responsibility for his conduct, has done all he can to mitigate his actions, and has suffered greatly as a result of his offense conduct. [redacted]

It is unnecessary to impose a sentence of incarceration in order to afford adequate deterrence against Dr. Lipsky committing future crimes nor to teach him respect for the law, for he has learned that lesson and much more. The shame he has experienced and disappointment in himself for letting down the public, his family, his friends, and his clients, will stay with him for the rest of his life. He has lost his business which was the main source of income for his family, and he has lost his profession. And Dr. Lipksy's family is suffering greatly as a result. As Mrs. Lipsky explains:

> Your honor, the impact of these last two years on our entire family has truly devastated Richard. I have seen him break down in tears when apologizing for his behavior to the son and daughter who have always looked up to him. Richard always was the "hero" to Matt and Rachele and now he is someone that the neighbors are whispering about. I have seen him worry about not being able to attend our son's wedding next summer or not being able to witness Rachele graduating from her Nursing program. But I think the one of the worst moments came when our son Matt, who is especially

> close to his dad, looked at him and said "you don't know how hard is has been to be your son this year".

*See* Tab 4.

Nor would a non-jail sentence undermine the goals of general deterrence. Nothing about the manner in which this case has been presented, whether in Court, in the media, or even herein, suggests that the criminal conduct at issue was anything but serious. The sentences handed down for Dr. Lipsky's co-defendants have been significant and have included periods of incarceration, all of which suggests the severity of the offense. However, none of those defendants is situated in the same manner as Dr. Lipsky. Were the public to know all of the unique circumstances that exist with respect to Dr. Lipsky, [REDACTED] its confidence in and respect for the criminal justice system would not be diminished by a non-jail sentence, nor would a non-jail sentence promote the perception that Dr. Lipsky's crime was not a serious one or that it will not be vigorously prosecuted by the government.

As the Supreme Court recognized in *Gall*, a sentence of probation is not letting the defendant off "easy":

> Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty. *See United States v. Knights,* 534 U.S. 112, 119, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001) ("Inherent in the very nature of probation is that probationers 'do not enjoy the absolute liberty to which every citizen is entitled'" (*quoting Griffin v. Wisconsin,* 483 U.S. 868, 874, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987))). Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking. USSG § 5B1.3. Most probationers are also subject to individual "special conditions" imposed by the court.

Gall, 552 U.S. at 47-48 (footnote omitted). In fact, *Gall* acknowledged that "a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing". *Gall*, 552 U.S. at 54. Indeed, in the case of a first time offender like Dr. Lipsky, incarceration is only a minor deterrent. *United States* v. *Castillo*2007 U.S. Dist. LEXIS 101879, at *19 (S.D.N.Y. 2007) (*citing United States* v. *Mishoe,* 241 F.3d 214, 220 (2d Cir. 2001)).

Nor is a jail sentence necessary to protect the public from Dr. Lipsky under § 3553(a)(2)(C). His criminal conduct ended nearly two years ago and he no longer is working as a lobbyist. He has shown not only acceptance of responsibility [redacted]

Finally, Dr. Lipsky is not in need of educational or vocational training, medical care, or other correctional treatment, as contemplated by § 3553(a)(2)(D).

**CONCLUSION**

A below-Guidelines non-jail sentence, with a substantial community service component, would be "sufficient, but not greater than necessary" to comply with the stated purposes of § 3553(a), and would allow Dr. Lipsky to continue to rebuild his life, be a productive member of society and tend to the needs of his family.

We thank the Court for its consideration.

September 24, 2012

Respectfully submitted,

GERALD B. LEFCOURT, P.C.

By: /s/ Gerald B. Lefcourt
Gerald B. Lefcourt (GBL 5030)
Faith A. Friedman (FAF 6066)

148 East 78th Street
New York, N.Y. 10075
(212) 737-0400 (phone)
(212) 988-6192 (fax)
Lefcourt@lefcourtlaw.com
Ffriedman@lefcourtlaw.com
*Attorneys for Richard Lipsky*